IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JERRY A. CRAWFORD                                                PLAINTIFF

v.                      Civil No. 05-2147

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                   DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Jerry A. Crawford, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration denying

his application for disability insurance benefits (DIB) under the provisions of Title II and

supplemental security income benefits (SSI) under Title XVI of the Social Security Act. The

court has before it the briefs of the parties (Doc. 11 & Doc. 12) and the transcript of the social

security proceedings.

### Procedural Background:

Crawford protectively filed his applications for DIB and SSI on April 26, 2002. (Tr. 51-

53, 252-254). Crawford initially alleged a disability onset date of April 15, 2002. (Tr. 51).

However, at the hearing before the Administrative Law Judge (ALJ), Crawford amended his

disability onset date to August 14, 2000. (Tr. 15). He alleged he was disabled due to depression

and pain in his knees, legs, ankles, and foot. (Tr. 15).

Crawford's applications were denied initially and on reconsideration. (Tr. 24-25, 26-27,

255, 261). He requested a hearing before an ALJ. (Tr. 37). A hearing was held on April 22,

-1-

2003. (Tr. 284-294). Crawford appeared and testified. (Tr. 270-287) Crawford was represented by counsel. (Tr. 266). Clyde W. Petete, a vocational expert, testified. (Tr. 290-292). Kenneth Wyrick, a friend and former co-worker of the claimant, also testified. (Tr. 287-290).

By written decision dated November 6, 2003, the ALJ found that while the evidence established Crawford had a fracture of a lower limb and traumatic arthritis, impairments that were severe, there was no medical evidence of an impairment that met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 16). The ALJ the concluded Crawford could not return to his past relevant work but had the residual functional capacity (RFC) to perform a full range of sedentary work on a sustained basis. (Tr. 19). The ALJ therefore found Crawford not disabled within the meaning of the Social Security Act. (Tr. 20).

On November 14, 2003, Crawford requested a review on the record. (Tr. 9). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Crawford's request for review. (Tr. 3-5).____

**Evidence Presented:**

At the hearing before the ALJ, Crawford testified he was forty-seven years old and has a high school education. (270-271). He lives with Kenneth and Ruth Wyrick. (Tr. 271). Crawford indicated his driver's license had been suspended in 1989 because of a driving while intoxicated charge and he just never got the license back. (Tr. 273).

Crawford indicated he had done work as a fitting torch operator and as a pipe fitter/welder. He worked for a house moving company from 1993 through 2000. (Tr. 278).

-2-

He last worked for Swenk House Movers. (Tr. 272). Crawford testified he drove heavy equipment and did anything else that needed to be done in connection with tearing a house down, loading it up, and unloading it. (Tr. 272).

On August 14, 2000, Crawford was involved in an on-the-job accident. (Tr. 274). Crawford was guiding the truck driver to the streets. (Tr. 274). Crawford guided the driver through a stoplight and then hopped on the truck. (Tr. 274). When Crawford hopped on the truck, he slipped on fuel that had been spilled on the fuel tank and steps. (Tr. 274-275). Crawford slipped and fell under the tires of the truck and it ran over him. (Tr. 275). The truck had a house on it. (Tr. 275). It crushed his one leg. (Tr. 275).

Crawford testified he was in the hospital for a little over a month while they rebuilt his leg. (Tr. 280). When he got out of the hospital, Crawford testified he really wasn't able to walk for more than a year. (Tr. 280). He used crutches to get around. (Tr. 281).

Initially he was going back and forth to Tulsa to see the doctor and then when the bills were not being paid they cut him off and told him to get a doctor in Ft. Smith. (Tr. 281). Crawford tried to go back to work but then got stress fractures from standing, walking, and carrying objects. (Tr. 281). Crawford made several attempts to go back to work but finally just gave up. (Tr. 281).

Crawford testified he has had problems with his leg every since the accident. (Tr. 281-282). Crawford stated his ankle is "stuck" and won't operate properly. (Tr. 282). Crawford indicated there is a bone sticking out on the side of his ankle. (Tr. 282). He assumes the screws are loose in his ankle and the knee. (Tr. 282). The farther he walks the bigger his ankle swells up. (Tr. 282). Crawford indicates the pain shoots all the way up from the bottom of his ankle

-3-

to the top of his leg. (Tr. 282). If he puts any kind of stress on the ankle or even coughs, the pain shoots down his leg. (Tr. 282).

Crawford testified he cannot sit for more than ten or twenty minutes and then he has to get up and walk around a little to stretch or he has to prop his leg up. (Tr. 283). Elevation helps for a short while and then his leg starts throbbing so he has to drop it back down and stretch. (Tr. 283).

Crawford also testified that he has problems with his neck and back. (Tr. 282). With respect to his neck, Crawford testified that the farther he walks it shoots pain straight up to the middle of his neck. (Tr. 283). He also indicated his neck pops and snaps. (Tr. 283).

Crawford indicates he has muscle spasms in his neck. (Tr. 284). He can lift objects as long as he is leaning up against something and not having to hold the object and carry it. (Tr. 284). Crawford's leg feels like it wants to bend and collapse. (Tr. 284).

Crawford testified he cannot bend, stoop, or crawl. (Tr. 284). He has great difficulty going up and down stairs. (Tr. 284).

Crawford testified he was not taking any medication at the time of the hearing because he could not afford it. (Tr. 276). His doctor wants to do surgery because the screws are loose and the rod is loose. (Tr. 286). This is causing him pain every day. (Tr. 286). However, the surgery got canceled because Crawford did not have the money to pay for it. (Tr. 285).

Crawford testified he basically does nothing all day. (Tr. 277). He used to hunt, fish, mow the lawn, and do things like that but cannot do these things anymore. (Tr. 286). He has trouble sleeping at night because of the pain. (Tr. 286).

-4-

Crawford testified the pain feels like an ice pick stabbing in his leg. (Tr. 286-287). He indicated the pain is basically unbearable from daylight to dark. (Tr. 287). For pain relief, he grits his teeth. (Tr. 287). He tried over-the-counter medication but it didn't work. (Tr. 287). The only income he has coming in is $112 of food stamps. (Tr. 287).

Kenneth Wyrick testified he used to work with Crawford at Swenk for awhile. (Tr. 288). Wyrick indicated he and his wife have taken Crawford in. (Tr. 288). Since the accident, Wyrick testified it seems like Crawford is always in pain. (Tr. 288). Wyrick indicated Crawford moves around a lot. (Tr. 288). Wyrick has also seen Crawford's leg go out on him. (Tr. 289).

Clyde Petete, a vocational expert, testified that Crawford's past relevant work was skilled and very heavy. (Tr. 291). Petete was then asked to assume they were talking about an individual who was the same age, had the same education and vocational background as Crawford. If the hypothetical claimant had the complaints as indicated by Crawford, and those were 100 percent credible, Petete was asked if there were any jobs the hypothetical claimant could perform. (Tr. 291). Petete indicated there were not. (Tr. 292).

The medical and vocational evidence in the transcript reveals the following. On August 14, 2000, Crawford was injured when he fell underneath a tractor-tractor and was ran over by the trailer. (Tr. 123). On August 14, 2000, Crawford was admitted to St. Mary Rogers Memorial Hospital. (Tr. 102). X-rays of his right knee and leg revealed a fractured patella and an oblique fracture through the proximal tibia with 1.5 cm. medical and 1 cm. posterior displacement of the distal tibial fracture fragment. (Tr. 103 & 105). An x-ray of his cervical spine showed mild narrowing on the intervertebral disc spaces at C3-4 and C4-5. (Tr. 110).

-5-

Crawford was transferred to the Tulsa Regional Medical Center. (Tr. 102). The admitting diagnoses were: right grade 3B open tibia fracture and right fifth metatarsal base fracture. (Tr. 118). On August 16, 2000, Crawford underwent an open reduction internal fixation of his right grade 3B open tibia fracture with placement of intramedullary rod. (Tr. 118, 133-134). During the operation, a disruption of the tibiofibular joint was noted. (Tr. 134). An incision was made and a threaded screw placed to hold it in a reduced position. (Tr. 134).

Crawford had significant soft tissue damage over the right lower extremity and underwent three separate irrigation and debridement procedures. (Tr. 118, 127-128, 129-130, 131-132). On September 7, 2000, Crawford underwent a split thickness skin graft for his tibia fracture wound. (Tr. 119, 125-126). The skin for the graft was harvested from Crawford's right anterior thigh. (Tr. 126). He was discharged on September 8, 2000. (Tr. 118-119). He was able to ambulate with crutch assistance and was non-weight bearing on his right lower extremity. (Tr. 119). He was to follow-up with Dr. Laurie Duckett in about five days and with Dr. Jeff Morris in three weeks. (Tr. 119).

On October 11, 2000, Crawford was again admitted to Tulsa Regional Medical Center. (Tr. 157). Crawford was admitted because of a decreased range of motion of the right knee and "arthrofibrosis." (Tr. 158). The proximal tibia/fibular screw and the distal locking screws were removed. (Tr. 158). After removal of the hardware, his knee was taken into full flexion. (Tr. 159). The knee was then taken through extension and Crawford was noted to have a 25 degree flexion contracture. (Tr. 159). His ankle was also noted to have a decreased range of motion due to an Achilles tendon contracture. (Tr. 159). It was concluded that stretching exercises on the Achilles tendon should be performed. (Tr. 159).

-6-

On September 26, 2000, Crawford was seen by Dr. Morris. (Tr. 162-163). Dr. Morris noted Crawford was doing fairly well but had some stiffness of the right knee and ankle secondary to disuse. (Tr. 162).

On October 24, 2000, Crawford was seen by Dr. Morris. (Tr. 161). Dr. Morris noted Crawford was ten days post hardware removal and was doing well. (Tr. 161). Crawford was complaining of swelling and medial knee pain now he was more active. (Tr. 161).

Examination showed Crawford was tender over the medial joint line with some inability to extend the knee consistent with internal derangement to the medial meniscus. (Tr. 161). Dr. Morris indicated he hoped this would get better with conservative treatment. (Tr. 161).

Crawford was to begin weight bearing as tolerated on the right leg and wean himself from the crutches. (Tr. 161). He was to continue contrast soaks, physical therapy, and rehabilitative exercises to the right leg. (Tr. 161).

On April 25, 2001, Dr. Keith J. Bolyard of the River Valley Orthopaedic Center saw Crawford on referral from Dr. Cheyne. (Tr. 167). Crawford was complaining of pain in the distal area of the tibia. (Tr. 167). Crawford indicated the pain had crept up on him over the last two to three weeks. (Tr. 167). Crawford also complained of swelling of the ankle and leg off and on. (Tr. 167).

A bone scan showed a remarkable increased uptake in the mid distal third junction and in the area of the distal locking screw compared to the uptake around the proximal tibia fracture which was minimal. (Tr. 167 & 231). Crawford had exquisite tenderness of the tibial shaft in the mid distal third junction and down to just before the flare of the medial malleolus. (Tr. 167). There was no particular tenderness about the ankle. (Tr. 167). He had some dysesthesia on the

AO72A
(Rev. 8/82)

dorsum of the foot and in the area of sensation of the deep peroneal nerve. (Tr. 167). His mediolateral and plantar sensation was normal. (Tr. 167).

The rod was prominent proximally. (Tr. 167). The proximal locking screw had some slight windshielding around it. (Tr. 167). Dr. Bolyard's impression was tibial stress reaction. (Tr. 168). Crawford was put back on his crutches and told to work on his ankle range of motion. (Tr. 168). Crawford was to be off work for four weeks. (Tr. 168).

On May 25, 2001, Dr. Bolyard saw Crawford. (Tr. 166). A bone scan had been done and Dr. Bolyard believed there was a severe tibial stress reaction. (Tr. 166). Crawford reported not doing much but Dr. Bolyard noted that he had asked Crawford to get back on his crutches and work on his ankle range of motion. (Tr. 166). Dr. Bolyard did not believe Crawford had been using his crutches. (Tr. 166).

Upon examination, Dr. Bolyard noted Crawford's tenderness had improved although there was still exquisite tenderness along the tibial shaft from the mid third, distal third down to he flare for the medical malleolus. (Tr. 166). No particular tenderness at the ankle was noted. (Tr. 166).

On June 21, 2001, Crawford was seen by Dr. Bolyard for a follow-up on Crawford's tibial stress fracture. (Tr. 164). It was noted that Crawford had last had a prescription for pain medicine in May and was continuing to feel better. (Tr. 164).

Crawford was limited to an area of pain down where his distal locking screw was removed. (Tr. 164). Crawford had some mild tenderness along the tibial shaft in that area with percussion. (Tr. 164). He also had some areas of abnormal sensation from his skin grafts. (Tr. 164). He no longer needed the walking boot. (Tr. 164).

-8-

X-rays of the right tibia showed no appreciable bony reaction. (Tr. 165). The fracture was well-healed and well-aligned. (Tr. 165). Dr. Morris was going to have Crawford return to work under controlled circumstances. (Tr. 164).

On May 7, 2002, Crawford completed a supplemental interview outline. (Tr. 78-82). He indicated he could take care of his own personal care needs without assistance. (Tr. 78).

He stated he could do laundry, dishes, vacuum/sweep, and take out the trash. (Tr. 78). He stated he could not do home repairs or mow the lawn. (Tr. 78). He indicated other people took care of these chores. (Tr. 78).

He stated he could not shop for groceries. (Tr. 78). Crawford indicated some of his friends did the shopping. (Tr. 78). Crawford indicated he prepared meals two times a week including sandwiches and frozen dinners. (Tr. 79). Since his disability began, Crawford indicated it took him longer to prepare meals. (Tr. 79).

Crawford indicated he could count change. (Tr. 79). A friend pays his bills for him. (Tr. 79). He indicated he could not drive and couldn't not walk because he was in too much pain and his ankle was stiff and if he bent his knee or leg it hurt. (Tr. 79).

He uses a cane when walking. (Tr. 79). Crawford spends his time watching television, listening to the radio, reading, and visiting with friends and relatives. (Tr. 79). He does not do any recreational activities because of the pain from his injury. (Tr. 79).

He indicated his disability had made him quit his job or he had been fired. (Tr. 79). He stated he cannot walk, stand, run, crawl, or lift heavy objects. (Tr. 79).

He indicated he suffers from unusual fatigue and has to rest twice or more a day but didn't know how long he rested. (Tr. 80). When asked to describe his pain or other symptoms,

-9-

Crawford replied: "severe pain." (Tr. 80). Crawford stated the pain interfered with his sleep and was located in his left knee, leg, ankle, and foot. (Tr. 80). He indicated the pain was continuous. (Tr. 80).

Walking, crawling, running, driving, or carrying heavy articles all cause the pain. (Tr. 80). He indicated he could only stand/walk for one minute. (Tr. 80).

Crawford indicated nothing helped with the pain. (Tr. 80). He stated he has tried everything. (Tr. 80). He was taking hydrocodone for the pain. (Tr. 80). Since his disability began on an average day, Crawford indicated he watched television and kept his leg elevated. (Tr. 81).

On June 12, 2002, Crawford was seen by Dr. Robert Bebout. (Tr. 173). X-rays showed the rod was loose with windshield-wipering about the rod and proximal screw. (Tr. 173). There was no significant redness or swelling of the extremity. (Tr. 173). However, Crawford had a little bit of heel cord tightness, complaints of some dysesthesia in the extremity, and in Dr. Bebout's opinion probably some neurological injury. (Tr. 173). Crawford's range of motion of the knee was well-maintained. (Tr. 173).

Dr. Bebout indicated the rod could be removed and that should help some of Crawford's symptoms. (Tr. 173). However, it would not help with the neurological symptoms with the tingling and dysesthesia. (Tr. 173). It would make it easier for Crawford to stretch his heel cord and walk with a better gait pattern. (Tr. 173).

In April through July of 2002, was seen at the Brackman Family Practice complaining of pain in his thoracic and lumbar area with mild to moderate lateral radiating pain. (Tr. 177-198). He also complained of pain in his shoulder. (Tr. 177-198). He underwent massage

-10-

therapy, ultrasound treatment, electrical stimulation, myofascial release, and hydroculation packs. (Tr. 177).

On October 1, 2002, Dr. Alice Davidson, a medical consultantant, completed a residual physical functional capacity assessment on Crawford. (Tr. 204-211). With respect to exertional limitations, it stated Crawford could occasionally lift or carry ten pounds; could frequently lift or carry less than ten pounds; could stand or walk at least two hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited other than as show for lift and/or carry. (Tr. 205). With respect to postural limitations, it was noted Crawford could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 206).

No manipulative, visual, communicative or environmental limitations were established. (Tr. 207-208). It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 209). At that time, there was not a treating or examining source statement regarding Crawford's physical capacities in the file. (Tr. 210).

On March 27, 2003, Crawford was seen at Sparks Regional Medical Center. (Tr. 215-221). He was complaining of pain in his right knee and ankle. (Tr. 215). He was given crutches and a prescription for pain medication. (Tr. 215).

On June 17, 2003, Crawford underwent a consultative examination by Dr. Robert C. Thompson, of the Complete Orthopaedics & Sports Medicine. (Tr. 243). Crawford reported a history of having a scope done on his right knee in 1985 and two scopes one in 1985 and one in 1990 in the left knee. (Tr. 243). He also reported a crush injury to his knee and foot on the right side in August of 2000 when he was run over by a portion of a house moving vehicle. (Tr. 243).

-11-

He reported the toes on his left foot were also jammed and he could not straighten those. (tr. 243).

It was noted Crawford could stand but had limited motion. (Tr. 243). Further it was noted that there was pain and limited endurance in a standing position and he was unable to walk long distances. (Tr. 243).

Examination showed normal upper extremities, normal neurological of the upper cervical spine, normal motion of the lumbar spine, and normal hips. (Tr. 243). In the right knee, there was a limited range of motion of zero to 120. (Tr. 243). The left knee range of motion was zero to 125. (Tr. 243). Crawford was noted to have ten degrees of plantar fixed contracture. (Tr. 243). He has further flexion of about twenty more degrees. (Tr. 243). He cannot dorsiflex on the right at all and is basically 10 degrees short of dorsiflexion. (Tr. 243). The left ankle is normal. (Tr. 243). All wounds were well healed. (Tr. 243). There was some loss of sensation associated with the wounds in his leg otherwise he was neurologically normal in the lower extremity. (Tr. 243).

Dr. Thompson also completed a medical source statement of ability to do work-related activities (physical). (Tr. 245-248). Dr. Thompson noted that Crawford had limitations with respect to standing and walking but his upper extremities were within normal limits. (Tr. 245). Dr. Thompson indicated Crawford could stand and/or walk less than two hours in an eight hour workday because of the multiple surgeries and the degree of osteoarthritis. (Tr. 245).

Crawford was not limited in his ability to sit or push and pull. (Tr. 246). With respect to postural limitations, Dr. Thompson indicated Crawford should never climb, balance, kneel, crouch, crawl, or stoop. (Tr. 246). Dr. Thompson based this on the multiple surgeries to

AO72A
(Rev. 8/82)

Crawford's right knee, the decreased range of motion, and degenerative changes. (Tr. 246).

Finally, Dr. Thompson believed Crawford should have limited exposure to hazards such as

machinery, heights, etc. (Tr. 248).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind

would find it adequate to support the Commissioner's decision. The ALJ's decision must be

affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d

964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the

Commissioner's decision, the court may not reverse it simply because substantial evidence exists

in the record that would have supported a contrary outcome, or because the court would have

decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other

words, if after reviewing the record it is possible to draw two inconsistent positions from the

evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ

must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden

of proving his disability by establishing a physical or mental disability that has lasted at least one

year and that prevents him from engaging in any substantial gainful activity. *Pearsall v.

Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A),

1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by

-13-

medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

Crawford contends remand is necessary for several reasons. First, he argues the ALJ erred in discrediting his subjective complaints of pain. Crawford argues the medical records support his claim of chronic pain and of his limited ability to engage in activities. Second, he contends the ALJ inaccurately determined his residual functional capacity. Crawford points out that Dr. Thompson indicated Crawford was able to stand or walk for less than two hours in an eight hour work day. Crawford notes that this limitation alone precludes him from doing a full range of sedentary work. Finally, Crawford argues it was error for the ALJ to apply the Medical-Vocational Guidelines.

-14-

We first address the ALJ's assessment of Crawford's subjective complaints. The ALJ was required to consider all the evidence relating to Crawford's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id.* As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003).

In discrediting Crawford's subjective complaints of pain, the ALJ focused his attention on plaintiff's reported ability to perform various household chores and care for his personal needs. (Tr. 18-19). The ALJ also stressed the fact that Crawford was taking no prescription pain medication and had not followed through on the doctor's recommendation that the rod be removed from his leg. (Tr. 18-19).

In describing Crawford's abilities to perform certain household tasks, the ALJ ignored the limited ability Crawford indicated he had to engage in activities of daily living. At the hearing, Crawford testified he basically sat around all day and changed position frequently. (Tr. 277). Crawford indicated he is in pain all the time and can only sit for ten to twenty minutes at a time before he must change position. (Tr. 282-283). To lift a gallon of milk Crawford indicated he had to be leaning against something and not have to hold it or carry it. (Tr. 284).

-15-

He stated he could not bend or stoop and had great difficulty going up or down stairs. (Tr. 284). Crawford also testified he had applied for Medicaid but was told he could not draw any kind of Medicaid benefits until his Social Security case was resolved. (Tr. 277).

We believe the ALJ improperly discredited plaintiff's subjective complaints of pain. On remand the ALJ should re-evaluate plaintiff's subjective allegations in accordance with *Polaski*, 739 F.2d at 1322, specifically discussing each *Polaski* factor in the context of plaintiff's particular case.

We next turn to the ALJ's determination of Crawford's RFC. "RFC is defined as 'the most [a claimant] can still do despite' his or her 'physical or mental limitations." *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)(*quoting* 20 C.F.R. § 404.1545(a)). "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" *Masterson*, 363 F.3d at 737 (*quoting* S.S.R. 96-8p). It is the ALJ's responsibility to determine a claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others and a claimant's own description of his limitations. 20 C.F.R. §§ 404.1546, 416.946; *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

In determining Crawford's RFC the ALJ relied on the residual functional capacity assessment done by a non-examining physician. (Tr. 204-210). This assessment was done prior to Crawford being sent for a consultative examination by an orthopaedic doctor, Dr. Robert C. Thompson. (Tr. 244-250). Dr. Thompson found that Crawford could stand or walk less than two hours in an eight hour work day and could never climb, balance, kneel, crouch, crawl, or stoop. (Tr. 245-246). In the area where Dr. Thompson was to indicate whether there were

-16-

limitations on Crawford's ability to lift and/or carry, Dr. Thompson merely wrote: standing & walking limitation–upper extremities within normal limits. (Tr. 245). Dr. Thompson was not asked to explain what he meant by this comment. The ALJ did not explain why he failed to credit Dr. Thompson's report that there were limitations on Crawford's ability to stand and/or walk and on his ability to climb, balance, kneel, crouch, crawl, or stoop. Instead, the ALJ merely adopted the RFC of the non-examining physician. While the ALJ may have had valid reasons for rejecting Dr. Thompson's report, the ALJ failed to explain what these reasons were. We believe the ALJ erred in this regard. On remand, the ALJ should seek further information from Dr. Thompson regarding any limitations on Crawford's ability to lift and/or carry. Additionally, information should be sought on Crawford's need to change positions frequently.

Finally, we turn to Crawford's argument that the ALJ erred in referring to the Medical-Vocational Guidelines. Crawford contends the ALJ erred in this regard because he needs to change positions frequently and thus cannot perform the full range of sedentary work. He also maintains he has significant non-exertional impairments such as pain and the inability to climb, balance, kneel, crouch, crawl, and stoop.

In *Lucy v. Chater*, 113 F.3d 905 (8th Cir. 1997)(citation omitted), the court stated:

> When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity. If the claimant's characteristics do not differ significantly from those contemplated in the Medical-Vocational Guidelines, the ALJ may rely on those Guidelines alone to direct a finding of disabled or not disabled.

*Id.* at 908. "In other words, the law of this circuit states an ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding,

that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003)(internal quotation marks and citation omitted).

In this case, the ALJ specifically found that Crawford had no non-exertional limitations. (Tr. 20). In so finding, as noted above, the ALJ did not explain why he discredited Dr. Thompson's determination that Crawford was unable to climb, balance, kneel, crouch, crawl, or stoop. (Tr. 246). It is necessary to remand this case for an explanation of why the ALJ accepted the findings of a non-examining physician over those of an examining physician. If on remand, the ALJ should find Crawford has non-exertional impairments it would be necessary to utilize the services of a vocational expert rather than utilizing the Medical-Vocational Guidelines.

On remand, the additional information should also be sought from Crawford's treating doctors regarding his ability to do work-related activities. Finally, information should be sought on whether Crawford needs to be able to change positions frequently during the day.

**<u>Conclusion</u>**:

For the reasons stated, I find that the decision of the Commissioner should be and hereby is reversed. A separate judgment in accordance with the above will be entered.

Dated this 22nd day of September 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)